Let me begin by thanking everyone for being willing to do this on a telephone basis. I know it's a little awkward, but it enables us to re-hear this case, or to hear this case now. And we are gathered to consider the case of K. E. C. v. Ayala, No. 18-15342. And with that, Mr. Guarado, do you wish to begin? Yes, thank you, Your Honor. I want to start with the Monell claim first that was dismissed by way of summary judgment by the trial judge. And I believe that was an error for numerous reasons. I believe that the evidence supported a practice or custom of the County of Kern that resulted in deliberate indifference to persons with serious medical need, and specifically in this case, and with the evidence that was presented, to persons who were suicidal. What specific policy or practice are you referring to? Well, there are several elements of it. Number one, you have a cell without a surveillance camera. Number two, you have a suicide cell which, as opposed to the other suicide cells in the jail, one half of it is completely obscured. The third element of, I'll say, that customer practice is the placement of the fan, which by all the evidence had been there for as long as anyone can remember, and in the condition where the line was cut. And I believe... But, counsel, there was no previous problem with the fan or the cord was there, and no previous suicide? Am I right about that? That's true, but I don't think that gets to a conclusion that this was not, I'll say, a customer practice that resulted in deliberate indifference, because I think there's that case, it's City of Oklahoma versus Tuttle, and that's cited in my reply brief, and that essentially says that a 1983 cause of action is as available for the first victim of a policy or custom, which would be foreseeably and unavoidably cause an individual to be subjected to a deprivation of a constitutional right. So I don't think... Right, but it's hard to view a cord in an unfortunate location as a policy, as opposed to, you know, I mean, policy generally would seem to require some sort of, you know, decision-making that isn't an object, I guess. Well, there is a decision. I apologize for talking over you. I think it is a policy, or it isn't a policy, it's a practice or custom, and Castro defines practice or custom as any permanent, widespread, well-settled practice or custom that constitutes the standard operating procedure of the county, and I think in this particular instance, placing a means of being able to commit suicide within 18 inches of the suicide cell that Mr. Campos was in, that constitutes a standard operating procedure when you consider that the fan was there because what... and the fan was there for the convenience of the officers. It was pointed at the desk. It was placed there not only because the plug was in the pipe chase, as it's called, but because the door would be opened and the cool air from the pipe chase would be blown towards the desk, and when you consider that placement along with the fact that, you know, air conditioning apparently was very sporadic in the jail, I believe that that rises to a practice or custom. And then when you consider that factor with the other factors of the configuration of the jail cell and the fact that there was no mental health care there. I mean, I exhibit 10 of my supporting papers to the motion for summary judgment were the medical records from Kern County Medical, and they set forth numerous instances all the way back to February 2012 where Mr. Campos had been in jail. He always becomes suicidal. But he was on suicide watch, so he was recognized to have that problem. There was no indifference to that, and he was checked on at quite regular intervals. So I'm not sure how the absence of a psychological evaluation would matter because they'd already evaluated him as being suicidal. Well, I mean, it's a situation where I think that may not be directly the cause of the injury in question, but it seems to me it's part and parcel of the consideration that this court has to make to make the determination as to whether there is deliberate indifference in this case. Judge Graber, this is Judge Watson. I have a couple of questions when it's appropriate. Please jump right in. All right. Mr. Garrato, what evidence is there of he was there for 48 hours this time. Is that correct? That's approximately correct, yes, sir. All right, so arrested on the 8th and moved to the second deck, the B deck, I guess, and into this cell on the 10th. Is that correct? Right, correct. And on what dates did he beat his head against the bars, and did they take him to the hospital to be looked at? Okay, he was taken. Okay, let me just see because I have that down. Okay, he was on the 8th, he banged himself against the wall, was taken to the restraint chair and then to the safety cell. On the 9th, recommended psychological evaluation. Okay, and the 9th at approximately 9, 10 a.m., and that's page 346 of the excerpts of the record, it says, banging head on bars, cut to head, taken to ER, senior and sergeant aware. And what's interesting about, you know, being taken to the hospital is that when you were taken to the hospital, you were seen for one complaint, or I'll say the chief complaint, and in this particular instance, he wasn't taken because he was suicidal and needed a mental health evaluation. Was that referenced in the records at all? On page 514, which is the correctional health, mental health screening, which is dated 8-9-2013. And that was done by someone who wasn't licensed to do that. That's correct. That's by a fellow named David Contreras, who's a licensed vocational nurse, and he recommended a psych evaluation. He recommended it and then it wasn't followed through with. That is correct. That is correct. So were the other two suicide watch cells occupied? Is there any evidence of it? Okay. The one around the corner, at least one of them was, because in the incident report, which is also in my papers, in opposition to the motion for summary judgment, there is a statement in the incident report of a fellow who was in the cell, which would be, I would say, share a wall with Mr. Campos' cell, because what you have to do in order to get to the two cells with loop cameras is you have to enter into a hallway and they're there rather than, I'll say, facing the desk in the, I'll say, common area where Mr. Campos was and the officers were. So at least one of those cells was occupied, and quite honestly I think that the evidence is devoid of whether anybody was in the second suicide cell, suicide watch cell. Which begs the question of why was he placed in the only cell without a camera? True. That's very true. The cord on this fan certainly would have been operated, the fan would have been operated in violation of anyone's reasonable life safety code, I believe. I would agree. But it had been operated for as long as anyone could remember. Is that correct? Right. I mean, you know, the evidence is that the three out of four, Collier, Saldana, and Bath, the fan had been in that particular location as long as they had been working in the central receiving facility, and that was, I mean, and they were all fairly new deputies, and they had all been there from the first part of 2013, so we're talking about a period of at least six months when that fan was there, was being operated with the broken cord, and in that particular location, 18 inches away from the cell where Mr. Campos was. And do you allege that the two cells that had constant loop cameras, only that they were capable of being monitored constantly, or that they were monitored constantly? They were monitored constantly because the monitoring occurs on another floor, in I'll say what I call a control room. So they were, you know, somebody sits at a desk, somebody watches the camera, or is supposed to watch the camera. Thank you. So. Counsel, your time is beginning to run short. I want to check and make sure it's shorter. Did you have any questions? Well, the only question I had regarding the fan, are you essentially arguing that if you make a mistake, if the jail makes a mistake that becomes longstanding, that it becomes a policy or practice of the county? I don't, because, I mean, CASTRO seems to talk about this, and it talks about, okay, it says, in evaluating the facts of the case, you must consider the context in which the jails operate, and you should give deference to jail officials of the adoption and execution of policies and procedures, you know, et cetera. So, you know, I'm not saying if they make a mistake, that rises to deliberate indifference. I'm not saying that at all, because I don't think that's the law. I mean, that would be nice if that was the law, because it would make it a lot easier for attorneys like me. But it's not the law. Well, what's the difference between this case and just a mistake that goes on for a long time in the placement of the fan? Because I think when you have a mistake that rises to being a substantial risk of serious harm to a prisoner, I think that's where... It becomes a policy or practice? Well, it's not a... I wouldn't even... I don't think this is... This is not a policy case. I don't like the... I don't like the word policy. But that's the basis of... Monel, liability is not responding of superior. It has to be a practice, policy, or custom of the county itself, not merely negligent on leaving a court nearby which isn't corrected. That doesn't constitute a policy or deliberate indifference, as it would seem to me. Well, okay. I guess what I'm trying to say in an inarticulate fashion is I think that it rises to a practice or custom. When I think of policies, and I may be thinking it in too simplistic a manner, I'm thinking of a policy in a written policy, and that's not what we have here. We have a customer practice that rises to an unwritten policy. I think we'll hear now from Mr. Fontes, and we'll give you a minute or two for rebuttal after. Thank you, Your Honor. May it please the court, good afternoon, everyone. You know, I think this case has been fairly, you know, thoroughly briefed. I don't really have any prepared remarks, but I wanted to make myself available to answer any questions that the court might have. Well, my question for you is in terms of the, what I would call the architectural features, that is a policy or practice, the placement of a partition and the absence of a surveillance camera and so forth. And how, in view of that, leaving aside the placement of the fan as being a separate question, how do you distinguish Castro? Well, I think that the issue, at least my interpretation of it, is that if you look at Castro, you have an element there that you don't have here. You know, certainly my read of Castro, and I would agree with Mr. Garato to an extent, that I think that the physical configuration of a cell such as this can be What I don't see in this case, though, which the court found in Castro was the deliberate indifference on the part of the policymakers. And essentially what we had in Castro was a situation where the Board of Supervisors for the defendant, the law enforcement agency, actually had in their policy manual requirements that there be greater monitoring than was present in the fact pattern. Additionally, the board had adopted the California Building Code, which also required greater visualization and audio monitoring. And so in Castro, at least the way I understand it, the court found that by the board, the policymakers adopting those rules, it was evidence of their recognition that the increased frequency or constant visualization of the inmate was essential. You don't have that here. There's been no evidence in this case to suggest why those cameras are in the cells that they are versus other ones. There is evidence that, as Mr. Garato pointed out, that the monitors for those cameras are not even on the same floor. They are down on, I believe, the first floor, and this is the third floor that the cell is on. And it's in a contribution. Mr. Fontes, I'm sorry, this is Judge Watson. You would argue that the cameras in the other cells are capable of constant monitoring but aren't necessarily constantly monitored. Is that correct? That's correct. My understanding is that they are in a control room, for lack of a better descriptor, and the deputy assigned to that control room has a multitude of duties, but the loop cameras are displayed there so that if the deputy wants to, they can look at the monitor and see what's going on in the cell, but I don't think they sit there and do nothing else but watch the camera. So essentially, I think, I'm sorry, go ahead, Your Honor. This monitoring is twice in a 30-minute period, basically, correct? That is the face-to-face monitoring. The deputies that are on staff on that floor per policy are required to make visual monitoring of the inmate twice at irregular intervals within every 30 minutes, and then that is documented in a log. The logs were also put into evidence as well as the testimony of the four deputies that worked the night shift and then the morning shift, and Mr. Campos was found hanging approximately seven minutes after the morning shift started. The morning shift, Diallo, I believe it was, the first task he had was a face card account, and so he actually visualizes and sees Campos at 7 o'clock straight up and then sees him again seven minutes later when he's doing the nursing call, and at that point Campos had moved from the bed and was hanging from the bar of the cell sitting on the floor. So my position on the, go ahead, Your Honor, I'm sorry. The previous deputy that saw him at 652? Yes. That he was standing in his cell? That's correct. I believe he was standing in his cell at that time. That was, I want to say, Saldana that was getting off at 7, and I believe both Saldana and his partner, in addition to that entry, also spoke to him as they were leaving the deck, because the elevator is literally just, you know, it's in that central area where the desk is, and from there you can see into the front part of Ayala's cell, so they actually spoke to him again after that last entry by the night shift.  And then one more question about the fan. If the fan was there for most of the year, as these two deputies would seem to say, is there any evidence of a supervisor acquiescing in its presence there? No, there's not. You know, it seems that from what we could tell from the evidence and the testimony that was elicited in this case, you know, we don't know how long the fan was there. We do know, as Mr. Garato said, that the fan at least had been there as long as these deputies that testified were working on that deck. I believe there was some testimony that it got moved around, but that the location it was in at the time of the incident was where it was normally stored. It was used in that location as well. As Mr. Garato said, the testimony was that inside the pipe chase that was between the two cells where the fan was, is where the electrical outlet was. And then there was another one somewhere else on the floor. But no, you know, there's no evidence that I'm aware of that any supervisor saw the fan. You know, and I know, I don't know that it's in evidence, but I know that the lieutenant in charge of the facility is not housed on that floor. Thank you. I interrupted you and please proceed with your argument if you have any. Your Honor, that's fine. I really don't. The only thing that I did want to correct, Mr. Garato indicated and it's in the briefing too, that the fan is 18 inches away from the suicide watch cell. And that's actually correct, but it's somewhat inaccurate because the fan in question has a large circular base at the bottom. And it is that circular base that was 18 inches away from the cell bars. As I understood the record, the vertical pole was 35 inches away from the bars. And from the inside of the cell, you could touch the closest part of the base 18 inches away. That's my understanding too, Your Honor. After the incident that, you know, as part of the investigation, they did take those measurements. And my understanding is that, you know, you've got this circular base, you've got the pole and on top of the pole, you have the housing and motor of the fan. And from there, the cord drapes down along or near the pole. And so I honestly, I don't know how far the cord itself was away from the cell bar, but I think it was closer to the 36 than the 18. And with that, I really don't have anything else to say, unless Your Honors have questions. I don't have any further, Judge Schroeder, do you have any questions? No, I have no further questions. Okay. Then, Mr. Serrato, you were back on for, you know, a minute or two or was that all? Getting to the fan for the moment, it was my understanding that this 18 inch mark, because the actual blades of the fan are, you're protected by this metal type housing. And it was my understanding that the 18 inches was between the cell and the closest part of that housing. So that, you know, somebody in the cell could, I'll say, pull the fan over and access the cord if they couldn't get it at its 35 inch mark. And the only other thing I would like to say is that in Judge Strode's ruling on the motion for summary judgment, he said at page 25, the court finds that the defendant's leaving of an electric fan with a at least arguably within reach of a suicidal detainee could be considered by a rational trier effect to be the moving force behind decedent's ultimate suicide. And that particular language was with regard to his analysis of the negligence claim. But I think that it is equally applicable to the constitutional issue here. And, you know, I just look at this case as clearer than Castro in terms of the policy or the custom and practice, because it seems when you bundle everything together, you have a custom or practice of deliberate indifference to somebody with a serious medical need. And that's exactly what the cause of the injury was in this particular case. And with that, Your Honor, I submit. Thank you both. And again, I appreciate everyone's willingness to use this not in person procedure in order for us to hear the arguments in this case. So the case just argued is submitted. And for this one special session, we are now adjourned. Thank you very much. Thank you, Your Honors. Thank you, Your Honors.
judges: Schroeder, Graber, M. Watson